UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Office of the Child Advocate on behalf of Jane Doe | ) | |
| Plaintiff | ) | Case No. 1:25-cv-649 |
| v. | ) | |
| Providence Public School Department | ) | |
| Defendant | ) | |

**COMPLAINT**

Plaintiff, Katelyn Medeiros, Child Advocate for the State of Rhode Island, files this action on behalf of Jane Doe (hereinafter J.D). J.D. is in the care, custody, and control of the Department of Children, Youth, and Families (DCYF) and placed in relative foster care. The Office of the Child Advocate (OCA) intervened in this matter on March 26, 2024, pursuant to Rhode Island General Law (R.I.G.L.) § 42-73-8. It was brought to our attention that J.D. was not being appropriately considered for special education services pursuant to 34 CFR §300 *et seq*. The Providence Public School Department (PPSD) became the Local Education Agency (LEA) responsible for J.D.'s education when J.D. was placed in relative foster care. At that time, DCYF made a referral to the Rhode Island Department of Education (RIDE) to appoint a surrogate parent to make educational decisions on behalf of J.D.

During a special education referral meeting on January 27, 2025, PPSD and the surrogate parent determined that J.D. only required accommodations through a Section 504 plan 34 C.F.R. §104.33. The OCA disagreed with this decision as well as the manner in which this decision was

made. The OCA sent a letter to all team members outlining the procedural violations of the Individuals with Disabilities Act (IDEA) that were made during this IEP meeting. The OCA received no response to this letter an no further action was taken by the recipients of this letter on behalf of J.D.

That spring, J.D. was receiving treatment in an outpatient partial program attended during school hours. J.D. successfully discharged from that program towards the end of the 2024-25 school year. PPSD and the surrogate parent reported that J.D. was doing well in school. Over the next six (6) months, the OCA monitored J.D.'s progress and concluded that J.D.'s rights under the IDEA, specifically 20 U.S.C. §1412(a)(3) continued to be violated.

The hearing officer assigned to this matter determined that the OCA, by and through Child Advocate Katelyn Medeiros, lacked the authority to bring this complaint on behalf of J.D. The OCA argues that the hearing officer erred in making this decision. Additionally, the hearing officer erred in allowing RIDE to submit an amicus curiae brief supporting the dismissal of the due process complaint due to lack of standing. The hearing officer allowed the submission of the amicus curiae brief over the OCA's objection.

**PARTIES**

1. The Plaintiff, Katelyn Medeiros is the Child Advocate for the State of Rhode Island and is bringing this legal action on behalf of J.D. pursuant to R.I.G.L. § 42-73-7(6), which states in relevant part that,

> "The child advocate shall perform the following duties:
> (6) Take all possible action including, but not limited to, programs of public education, legislative advocacy, and formal legal action, to ensure and secure the legal, civil, and special rights of children subject to the provisions of § 42-73-9.1 and chapter 72 of this title;

2. The Defendant, Providence Public School Department, is the Local Education Agency (LEA) and is required by the IDEA to provide services and supports to every child in their district who may need special education and related services.

## JURISDICTION

3. This action commenced under the IDEA, as amended, 20 U.S.C. § 1400 *et seq*. supplemented by Rhode Island's Regulations Governing the Education of Children with Disabilities and their implementing federal and state regulations.
4. This Court's jurisdiction is pursuant to 20 U.S.C. §§ 1415(i)(2)(A) and 28 U.S.C. 1331.
5. This action regards the Plaintiff's standing to file a request for a due process hearing with RIDE under 20 U.S.C. §§ 1415(b)(7)(A). Plaintiff seeks judicial review of an administrative decision of a duly appointed hearing officer finding that Plaintiff did not have standing to file a request for a due process complaint under 34 C.F.R. § 300.507(a) and the admission of an amicus curiae brief by RIDE.
6. The administrative decision was issued by a hearing officer appointed by RIDE pursuant to 20 U.S.C. § 1415(f) and 34 C.F.R. 300.511. A true and redacted copy of the hearing officer's decision is attached as Exhibit 1.

## FACTS

7. On March 26, 2024, the OCA intervened in J.D.'s case, pursuant R.I.G.L. § 42-73-7.
8. J.D. has a significant history of truancy, missing a total of 233 school days between kindergarten and fifth grade in their prior school department.
9. In the second grade, J.D. qualified for special education services under the Specific Learning Disorder category. J.D. received special education services including support in

math, writing, and social emotional learning and behavior from the second grade until February 28, 2024, when they were exited from special education in the fifth grade.

10. It was reported to the OCA by an outside provider that during a school meeting in which the provider participated, the principal stated that J.D. was removed from special education due to truancy.

11. On May 1, 2024, an IEP meeting was held where J.D. was referred again by their parent for special education services. J.D.'s prior school department denied the request, stating that they did not have a suspicion that J.D. had a disability that may require specialized instruction.

12. On May 10, 2024, the OCA participated in a follow-up special education referral meeting. The OCA stated that J.D. had a full-scale IQ of 78 and a significant history of truancy. Further, the OCA noted that J.D.'s prior school department's most recent psychological evaluation stated that J.D. "exhibited significant conduct problems and elevated levels of learning problems within the classroom." The OCA noted that J.D. was currently failing their classes. J.D.'s prior school department informed the team that, in fact, a special education teacher was currently providing J.D. with daily special education services outside of J.D.'s regular classroom setting. However, they again denied the referral for a special education evaluation because they stated that they did not have a suspicion that J.D. had a disability that may require specialized instruction.

13. On June 21, 2024, another school meeting was held in which J.D.'s prior school department agreed to evaluate J.D. for the purposes of developing a 504 plan. A psychological evaluation was completed later that summer.

14. On August 13, 2024, the OCA was notified that J.D. had been moved to a relative foster placement in Providence.

15. On September 10, 2024, the OCA was notified that an ESSA call had taken place and that DCYF had determined that PPSD would be J.D.'s new school district of record. J.D. was thereafter enrolled in PPSD.

16. On November 27, 2024, the OCA was notified that that DCYF referred J.D. for a special education evaluation which was denied reportedly because J.D.'s prior school department had not forwarded the clinical evaluation completed the prior summer to PPSD.

17. On December 2, 2024, the OCA was notified that an educational surrogate parent had been assigned to J.D.'s case. The OCA reached out to the educational surrogate parent that day to suggest scheduling a provider meeting.

18. On January 6, 2025, a provider meeting was held in which the surrogate parent notified the team that PPSD had scheduled a special education referral meeting for the following day.

19. The IEP referral meeting was rescheduled to January 27, 2025 so that PPSD had time to receive and review the prior school department's clinical evaluation. The clinical evaluation diagnosed J.D. with Post Traumatic Stress Disorder, Major Depressive Disorder, and Attention Deficit Hyperactivity Disorder. PPSD noted that J.D. had been absent from school for 48 days. The meeting was run by PPSD's attorney rather than a representative of the Local Education Agency (LEA) as required by the IDEA. The team did not review the clinical evaluation but rather PPSD's attorney noted J.D.'s diagnoses at the end of the document and the team concluded that J.D. did not qualify for special education services.

20. The OCA objected, citing numerous procedural IDEA violations, to include PPSD's attorney running the meeting, no comprehensive review of the evaluation data, and a refusal to allow discussion of two IDEA categories under which J.D. would likely qualify for special education services (Emotional Disturbance or Other Health Impaired). Despite these objections, the educational surrogate parent agreed with the team and the meeting was concluded. The entire meeting took approximately five minutes.

21. On February 5, 2025, the OCA sent a letter to the PPSD special education director, the executive director and the coordinator of the educational surrogate parent program, and the entire DCYF team. The letter detailed the multiple procedural IDEA violations and asked PPSD to reconvene the referral team to ameliorate the IDEA violations. None of the recipients responded to the letter and no further action was taken by the recipients on behalf of J.D.

22. Over the next six (6) months, the OCA monitored J.D.'s progress and concluded that J.D.'s rights under the IDEA, specifically 20 U.S.C. §1412(a)(3) continued to be violated.

23. On August 14, 2025, the OCA filed a request for a due process hearing with RIDE. A true and redacted copy of the complaint is attached as Exhibit 2.

24. On August 27, 2025, legal counsel for PPSD filed a motion to dismiss (hereinafter Motion) the due process complaint. A true and redacted copy of the Motion is attached as Exhibit 3.

25. On August 28, 2025, the OCA filed an Objection to PPSD's Motion. A true and redacted copy of the Objection is attached as Exhibit 4.

26. On September 15, 2025, a meeting was held between the hearing officer, the OCA, legal counsel for PPSD, and members of the education surrogate parent program.

27. On September 18, 2025, PPSD submitted four (4) documents with regards to the surrogate parent's appointment. A true and redacted copy of the four documents is attached as Exhibits 5-8.

28. On September 24, 2025, the OCA submitted a memorandum of law with respect to the OCA's legal standing to file this due process complaint. A true and redacted copy of the Memorandum is attached as Exhibit 9.

29. On October 10, 2025, RIDE contacted the hearing officer, the OCA, and legal counsel for PPSD via email requesting that the hearing officer "abstain from rendering a final decision on the OCA's standing in this matter until RIDE's timely submission of … [an] amicus curiae brief." RIDE did not submit a motion to request the hearing officer's leave to submit the amicus curiae brief.

30. On October 15, 2025, the OCA objected to RIDE's proposed submission of an amicus curiae brief via email and stated that the OCA would file a formal objection if necessary.

31. On October 16, 2025, RIDE submitted the amicus curiae brief without having filed a petition seeking the hearing officer's leave to provide the brief and prior to the hearing officer ruling on the OCA's objection to the proposed brief.

32. On October 24, 2025, PPSD provided a letter written by the Executive Director of the Paul V. Sherlock Center on Disabilities (hereinafter Sherlock Center) which includes the Education Surrogate Parent Program. The purpose of the letter was to document that the complaint submitted by Katelyn Medeiros was not submitted by the assigned surrogate parent. The document stated that the due process complaint was submitted without the surrogate parent's knowledge or consent, and that the OCA did not contact the surrogate

parent to discuss the complaint. A true and redacted copy of the letter is attached as Exhibit 10.

33. On November 4, 2025, the OCA filed an objection to RIDE's submission of an amicus curiae brief. A true and redacted copy of the objection is attached as Exhibit 11.

34. Additionally on November 4, 2025, PPSD filed a memorandum of law in support of RIDE filing an amicus curiae brief in support of PPSD's motion to dismiss. A true and redacted copy of PPSD's Motion to Dismiss is attached as Exhibit 12.

35. On November 5, 2025, RIDE provided a memorandum of law in support of their petition to submit an amicus curiae brief. A true and redacted copy of RIDE's memorandum of law is attached as Exhibit 13.

36. On November 8, 2025, the hearing officer accepted RIDE's petition to file their amicus curiae brief in support of PPSD motion to dismiss. A true and redacted copy of the hearing officer's decision is attached as Exhibit 14.

37. On November 12, RIDE resubmitted their amicus curiae brief with an additional exhibit. A true and redacted copy of RIDE's amicus curiae brief is attached as Exhibit 15.

38. On November 21, 2025, PPSD submitted a memorandum of law supporting their motion to dismiss. A true and redacted copy of RIDE's amicus brief is attached as Exhibit 16.

39. Additionally, on November 21, 2025, the OCA submitted an updated memorandum of law with respect to the OCA's legal standing to file this due process complaint. A true and redacted copy of the Memorandum is attached as Exhibit 17.

40. On November 24, 2025, eighty-five (85) days after receiving PPSD's motion to dismiss, the hearing officer granted PPSD motion due to lack of standing by Katelyn Medeiros, as the Child Advocate, to file this complaint on behalf of J.D. See Exhibit 1.

## I. Count I: The hearing officer erred in allowing RIDE to submit an amicus curiae brief in this matter.

### a. A State Education Agency (SEA) cannot unilaterally dismiss, direct dismissal, or otherwise limit the issues subject to a due process complaint.

41. Plaintiff realleges the allegations set forth in Paragraphs 1-40.

42. As noted, on October 16, 2025, RIDE submitted an amicus curiae brief (hereinafter "Brief") to the hearing officer, asserting that the OCA did not have standing to file a due process complaint. See Exhibit 15.

43. The Brief concludes, stating, "For the reasons stated herein, this Hearing Officer should dismiss the due process complaint filed by the OCA, by and through Katelyn Medeiros, with prejudice." *Id.*

44. In a document titled, *Question and Answers on IDEA Part B Dispute Resolution Procedures* ("Q&A"), the U.S. Department of Education addressed whether an SEA may direct the dismissal of a due process complaint. The Q&A asked, "May State law authorize the SEA to unilaterally dismiss or otherwise limit the issues that can be the subject of a party's due process complaint?" to which the Q&A answered, "No. Under the IDEA, hearing officers have complete authority to determine the sufficiency of all due process complaints filed and to determine jurisdiction of issues raised in due process complaints consistent with 34 CFR §§300.508(d) and 300.513." *OSERS-Q-and-A-on-IDEA-Part-B-Dispute-Resolution-Procedures.pdf* at 43.

45. In a letter from the US Department of Education, Office for Special Education (OSEP), G. Thomas Bellamy stated, "Part B of the Education of the Handicapped Act (the precursor to the IDEA) does not provide any authority for an SEA to deny a parent's request for a hearing. 34 CFR §300.506(a). In fact, the … regulations specifically

prohibit local and State educational agency employees from functioning as due process hearing officers." See *Letter to Howey, 213 IDELR 147 (OSEP 1988).*

46. By stating that the "Hearing Officer should dismiss the due process complaint filed by the OCA, by and through Katelyn Medeiros, with prejudice", RIDE openly and unambiguously instructed a duly appointed hearing officer to dismiss a due process complaint in direct violation of the IDEA. See Exhibit 14. RIDE's Brief contains a thorough analysis of the facts and arguments followed by a definitive conclusion. *Id.* In so doing, RIDE acted as a hearing officer assessing a claim and rendering a conclusion, an act that is explicitly prohibited under 20 U.S.C. § 1415(f)(3)(A).

**b. <u>The IDEA requires impartiality by an SEA and complete adjudicatory independence.</u>**

47. 34 CFR §300.500 establishes that the State Education Agency (SEA) is responsible for ensuring that each public agency establishes, maintains, and implements procedural safeguards that address the rights and responsibilities of the parties involved in a due process hearing.

48. Additionally, 34 CFR §300.511(b) identifies that the SEA is the entity responsible for the conduct of an impartial due process hearing.

49. 34 CFR §300.511(c)(1)(i)(A) states that, minimally, a hearing officer may not be an employee of the SEA or the LEA that is involved in the education or care of the child.

50. The RIDE *Special Education Impartial Due Process Hearing Procedures Manual* (Manual) states that "RIDE is responsible for establishing, implementing, determining financial responsibility, and developing procedures for administering a system of due

process." *RIDE Special Education Impartial Due Process Hearing Procedures Manual* at 7.

51. The Manual augments the IDEA's minimum requirements of hearing officer eligibility, stating, "RIDE requires that impartial due process hearing officers: (1) Not have been employed by, or served as an agent of, a Rhode Island local education agency, state-operated school, or non-public special education school, for two years preceding appointment as a special education due process hearing officer; (2) Not have been an employee of the Rhode Island Department of Education; (3) Attend periodic updated training programs as scheduled by Rhode Island Department of Education; and (4) Conduct due process hearings within regulatory timelines, unless a specific extension of time is granted at the request of one of the parties." *Id.* at 13.

52. In *Heldman v. Sobol*, the Second Circuit stated, "The structure of IDEA … attests to Congress' concern for adjudicatory independence. The Act relies on parental involvement to contribute to the determination of what constitutes an appropriate education for a child. A system perceived by parents as tainted by biased adjudicators would deter parents from fulfilling their role under the Act. The success of IDEA's novel approach to protecting the rights of disabled children, thus, turns on ensuring the right to adjudicative independence." *Heldman on Behalf of T.H. v. Sobol, 962 F.2d 148 (2nd Cir. 1992).*

53. The court in *Heldman* went on to state that "[t]he Office of Special Education and Rehabilitative Services regulations implementing section 1415 also interpret IDEA as guaranteeing adjudicatory independence," concluding that "IDEA's language, legislative history, structure, and implementing regulations all bear witness that the Act prohibits the use of biased adjudicators — a prohibition that section 1415(e) permits parents to enforce

in federal court. Congress, thus, conferred on the parents of disabled children an enforceable legal right to an impartial hearing officer." *Id.*

54. In a policy letter dated January 15, 2009, the Assistant US Secretary of Education, Tracy R. Justesen, wrote to the Massachusetts Commissioner of Education, Mitchell D. Chester stating, "you believe that 'the system in Massachusetts for due process hearings and mediations has been and is operating in an impartial manner,' and that '[n]either the Commissioner nor anyone else in the Department [of Education] … reviews or tries to influence in any way decisions of individual hearing officers or mediators in ongoing cases.' You therefore ask for guidance regarding whether the current practice of MASSDE with respect to hearing officers and mediators meets the requirements of the IDEA and its implementing regulations and seek advice from OSEP regarding any changes that should be considered in the event your current practice is not consistent with the IDEA." *https://sites.ed.gov/idea/idea-files/policy-letter-january-15-2009-to-massachusetts-commissioner-of-education-mitchell-d-chester/.*

55. The letter went on to state, "OSERS requests that, within 90 days of the date of this letter, MASSDE provide OSEP with a plan setting out the specific steps it will take to ensure the impartiality of its dispute resolution system in a manner that complies with the IDEA." *Id.*

56. As federal law requires, and the above referenced guidance and case law demonstrate, the principle of impartiality is the bedrock of due process in the IDEA. The sole purpose of this thorough federal and state regulatory structure is to guarantee that an explicit and unmistakable wall exists between an SEA and a hearing officer so as to ensure (and to be seen ensuring) that a hearing officer decides a case in controversy without actual bias, the

perception of bias, or any form of undue influence from any outside party, specifically from an SEA. The U.S. Department of Education's Q&A explicitly states, "[t]he Part B regulations are designed to ensure the independence of hearing officers, while maintaining minimum qualifications." *OSERS-Q-and-A-on-IDEA-Part-B-Dispute-Resolution-Procedures.pdf* at 43.

57. RIDE's Brief represents a direct and unapologetic discarding of impartiality and an afront to the very regulatory scheme they are required by federal law to enforce. The Brief was nothing less than RIDE putting their thumb on the scale precisely as Congress sought to defend against when enacting the IDEA and its due process mechanism. In accepting the Brief, the OCA believes that bias may have been introduced into the process which the IDEA directly rejects and the court in *Heldman* vociferously opposed. The written decision to accept the Brief did not address any of the OCA's arguments regarding bias and therefore did little to assuage the OCA's concerns about impartiality or adjudicative independence.

58. For the reasons herein stated, Plaintiff asks that the court find that the hearing officer erred in accepting RIDE's amicus curiae brief.

**II. Count II: The hearing officer erred in dismissing the due process complaint filed by the OCA, by and through Katelyn Medeiros, due to lack of standing.**

**a. <u>The OCA has legal standing under §300.30(a)(4) and R.I.G.L. § 42-73-7(6) to bring a due process complaint on behalf of a youth involved with the Department of Children, Youth, and Families</u>.**

59. Plaintiff realleges the allegations set forth in Paragraphs 1-58.

60. As noted, on November 24, 2025, the hearing officer issued his decision, stating in part that "Attorney Medeiros did not have authority to file the due process complaint on

behalf of [J.D.]. She did not receive authorization to file the complaint from either RIDE or [the surrogate parent]." He went on to state "No one authorized counsel to file the complaint." See Exhibit 1.

61. The hearing officer erred in concluding that the OCA did not have the standing required by the IDEA to file a due process complaint. *Id.*

62. It is the OCA's position that neither RIDE nor the surrogate parent's permission was required to file a due process complaint on behalf of J.D.

63. The OCA is an office that is somewhat unique to Rhode Island. The OCA was created in 1979 under R.I.G.L. § 42-73. There are 41 states that have a Child Advocate, Ombudsman, or similar office designed to provide some measure of oversight for their child welfare system. Of those 41 similar offices, only some have been granted statutory authority comparable to that of the Rhode Island OCA.

64. R.I.G.L. § 42-73-7(6) states that the Child Advocate shall "[t]ake all possible action including, but not limited to, programs of public education, legislative advocacy, and formal legal action, to secure and ensure the legal, civil, and special rights of children subject to the provisions of § 42-73-9.1 and chapter 72 of this title."

65. This language is significant because it imbues the OCA with a distinct statutory responsibility to ensure, inter alia, that the legal rights of all children in state care are protected and enforced.

66. Because the definition of a "parent" under 34 CFR §300.30 of the IDEA is the governing rule and features so prominently in this dispute, we have included the full language of the statute for reference. §300.30 states:

(a) Parent means—

(1) A biological or adoptive parent of a child;

> (2) A foster parent, unless State law, regulations, or contractual obligations with a State or local entity prohibit a foster parent from acting as a parent;
>
> (3) A guardian generally authorized to act as the child's parent, or authorized to make educational decisions for the child (but not the State if the child is a ward of the State);
>
> (4) An individual acting in the place of a biological or adoptive parent (including a grandparent, stepparent, or other relative) with whom the child lives, **or an individual who is legally responsible for the child's welfare** (emphasis added); or
>
> (5) A surrogate parent who has been appointed in accordance with §300.519 or section 639(a)(5) of the Act.

(b) (1) Except as provided in paragraph (b)(2) of this section, the biological or adoptive parent, when attempting to act as the parent under this part and when more than one party is qualified under paragraph (a) of this section to act as a parent, must be presumed to be the parent for purposes of this section unless the biological or adoptive parent does not have legal authority to make educational decisions for the child.

(2) If a judicial decree or order identifies a specific person or persons under paragraphs (a)(1) through (4) of this section to act as the "parent" of a child or to make educational decisions on behalf of a child, then such person or persons shall be determined to be the "parent" for purposes of this section.

67. 34 CFR 300.507(a) states "[a] parent or a public agency may file a due process complaint on any of the matters described in § 300.503(a)(1) and (2) (relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child).

68. The OCA filed the request for a due process hearing under the premise that our standing derives from the plain language of 300.30(a)(4) in combination with the OCA's statutory mandate under RIGL § 42-73-7(6). The language of 300.30(a)(4) specifically identifies the right of "an individual who is legally responsible for the child's welfare" to act as a parent for the purpose of making educational decisions on behalf of a child. Further, the language of the OCA's statute states that the child advocate is empowered to take all possible action, including formal legal action, to secure and ensure the legal, civil, and special rights of children in state care.

69. It is the OCA's position that the language of §300.30(a)(4) coupled with the language of R.I.G.L. § 42-73-7(6) allows the OCA to meet its statutory obligations by providing the child advocate with the standing required under 34 CFR 300.507(a) to engage in due process as an individual who is legally responsible for the welfare of a child in state care.

70. The ultimate crux of the disagreement in this case is the interpretation of "an individual who is legally responsible for a child's welfare." It is the OCA's position that that phrase minimally does not exclude any individual who has been identified, be it through state law or other legal provision, as an individual who is legally responsible for a child's welfare.

71. Moreover, despite multiple opportunities to do so, neither PPSD nor RIDE has provided the OCA or the hearing officer with any case law or other form of independent evidence that directly or indirectly refutes the OCA's interpretation of 300.30(a)(4) nor otherwise abrogates, mitigates, or limits the OCA's legal authority to fulfill the role of the parent for the express purpose of requesting a due process hearing.

**b. <u>The appointment of an individual who qualifies as a "parent" under the IDEA does not abrogate the rights of another party who is equally qualified as a parent.</u>**

72. In PPSD's Motion, they stated, "Under IDEA 34 CFR 300.30(b)(2) if a judicial decrees [sic] or order identifies a specific person to act as the parent of a child or to make educational decisions on the child's behalf, then that person is the child's "parent". Theresa Barros is appointed to be the educational advocate, she is the "parent" and she did not file this complaint nor does her office agree with this complaint."

73. Further, in RIDE's Brief, they state that the appointed surrogate parent "is the only individual allowed under state and federal law to make educational decisions on behalf of

the student, including the decision of whether or not to file and pursue a special education due process complaint … ." See Exhibit 15.

74. The U.S. Court of Appeals for the Third Circuit addressed the issue of two parties equally claiming to qualify as a "parent" under the IDEA in *Q. T. v. Pottsgrove School District.* In *Pottsgrove*, a court order granted a grandmother primary physical and legal custody of her grandchild, H.P.-B. *Q. T. v. Pottsgrove School District, No. 22-1648 (3d Cir. 2023).* However, H.P.-B lived with her adult cousin, Q.T. In March 2020, Q.T. filed a due process complaint on behalf of H.P.-B, which the school department sought to dismiss claiming that Q.T. did not qualify as a parent under the IDEA. *Id.* The hearing officer agreed, holding that, due to the court order, H.P.-B's grandmother was the only person able to act as a parent under the IDEA and therefore, Q.T. did not qualify as a parent. *Id.* Q.T. appealed, yet the District Court affirmed the hearing officer's decision, noting that the "'[t]he Hearing Officer's decision was based on the plain text of the federal regulation,' i.e., C.F.R. 34 § 300.30(b)(2)." *Id.*

75. Upon review, the Third Circuit reversed the District Court, stating that "Q.T.'s argument presents an issue of first impression in the circuit and requires us to determine who has the authority to act as the 'parent' for purposes of the IDEA." *Id.* The Third Circuit continued, "[a]s both parties note, the statute defines 'parent' broadly" going on to state that "[t]he text of the statute [300.30] does indicate an unambiguous congressional intent to qualify multiple persons as parents for purposes of the IDEA." *Id.* The Third Circuit concluded, "the District Court erred in finding that Q.T. did not qualify as H.P.-B's parent and thus lacked standing to file a due process complaint on H.P.-B's behalf. *Id.*

We reverse the District Court's decision and remand with instructions to vacate the hearing officer's order dismissing Q.T.'s due process complaint." *Id.*

76. The OCA does not dispute that a surrogate parent was not assigned by RIDE to this case nor that the surrogate parent does not have legal standing. Rather, as in *Pottsgrove*, it is the OCA's position that, in this case, there exists two parties who both qualify as a "parent" under the plain language of 300.30 for the purpose of requesting a due process hearing. The decision in *Pottsgrove* confirms the validity of this position and refutes the hearing officer's decision as well as PPSD and RIDE's position that only one party (here the surrogate parent) has the authority to act as a parent under the language of the IDEA.

77. As the decision in *Pottsgrove* clearly demonstrates, multiple parties may qualify as a "parent" under the IDEA at the same time even if one of the parties has a judicial decree identifying them as a parent. Further, it is the OCA's position that it is reasonable for a hearing officer or a court to interpret the language of R.I.G.L. § 42-73-7(6), directing the child advocate to "[t]ake all possible action including, but not limited to … formal legal action, to secure and ensure the legal, civil, and special rights of children subject to the provisions of § 42-73-9.1 and chapter 72 of this title" as specifically identifying the child advocate as an "individual who is legally responsible for a child's welfare" when a child is in state care, pursuant to 300.30(a)(4).

**c. <u>The OCA asserts that the legislative intent behind both the IDEA and R.I.G.L. support the OCA's claim that both the OCA and the Surrogate Parent have a right to file a due process complaint.</u>**

78. Recognizing the OCA's standing to request a due process hearing does not offend the language nor, as importantly, the intent of either the IDEA or the state regulations. In fact, it is our position that recognizing the OCA's standing reflects the very intent of

these laws. By including the phrase "or an individual who is legally responsible for a child's welfare" in 300.30(a)(4) of the IDEA, Congress demonstrated their intent that the term "parent" be inclusive to allow those individuals deemed responsible for the well-being of a child to have the ability to engage in all available legal remedies and ensure the student's rights are protected and enforced.

79. Further, it is the OCA's position that the Rhode Island General Assembly had the same intent in creating the OCA. As noted, the language of our statute empowers the OCA to "Take all possible action including, but not limited to … formal legal action, to secure and ensure the legal, civil, and special rights of children subject to the provisions of R.I.G.L. § 42-73-9.1 and chapter 72 of this title." It seems clear that, in granting the OCA this authority, the General Assembly envisioned that legal action would include upholding all rights bestowed upon children in chapter 72, including educational rights and sought to empower the OCA with the authority required to enforce those rights.

80. One of the most significant functions of the OCA is to provide a layer of additional security for children in state care in the event that the systems designed to protect their rights are not enough, as is the case here. We believe that granting the OCA standing to bring a due process complaint under the IDEA and state law is consistent with the language and intent of both laws and upholds the fundamental principles of substantial justice by ensuring the most vulnerable kids in the state are able to access all legal mechanisms available to protect their rights. A finding that the OCA does not have standing would eliminate that layer of security and would leave the state's most vulnerable children without a safety net in the event that other systems fail.

**WHEREFORE**, the Plaintiff respectfully requests that the Court award the following relief:

1) Find that the hearing officer erred in accepting the amicus curiae brief from RIDE.
2) Reverse or vacate the hearing officer's decision and find that the OCA has standing under 34 C.F.R. §300.30(a)(4) to bring a due process complaint under the IDEA on behalf of J.D., a child in the care of the state.
3) That the complaint be remanded to the hearing officer for a proper due process hearing.
4) Such further relief as the Court may deem just and proper.

PRESENTED BY:

Bar # 90[illegible]7
Katelyn Medeiros
Child Advocate
Office of the Child Advocate
35 Howard Avenue
Cranston, RI 02920
(401) 462-4300
(401) 462-4305 (fax)